1
2
3

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

4
5
6
7
8
9
10
11

RICHARD HAWKS,

          Plaintiff,

v.

TODD BILLECI,

          Defendant.

Case No.  20-cv-01622-BLF

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

[Re:  ECF No. 8]

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Petitioner Richard Hawks is on probation in Contra Costa County in the custody of Todd Billeci, County Probation Officer.  In 2017, Petitioner was convicted in Contra Costa County Superior Court of false imprisonment of an elder; elder abuse likely to cause great bodily injury; and use of force to resist an executive officer.  This matter now comes before the Court on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254(d).  *See* Amended Petition, ECF No. 8.  Petitioner brings three habeas claims.  In his first claim, Petitioner argues that the State Appellate Court's finding—that Petitioner's convictions of felony false imprisonment of an elder and elder abuse likely to cause great bodily injury were supported by substantial evidence—was unreasonable.  In his second and third claims, Petitioner argues that video footage (the "Video Footage")[1] depicting Petitioner's arrest is (1) material evidence that was suppressed by the Prosecution under *Brady v. Maryland*, 373 U.S. 83 (1963) and (2) new evidence that would have changed the outcome of Petitioner's trial under California Penal Code § 1473(b).  Respondent opposes.  *See* Answer, ECF No. 18-1.

Having considered the parties' submissions, the record in the case, and the applicable law,

---

[1] The Video Footage was lodged with the Court.  *See* ECF No. 24.

the Court DENIES the petition and the request for an evidentiary hearing.

## I.   PROCEDURAL HISTORY

The following procedural history is undisputed, and therefore drawn from the Amended Petition (ECF No. 8 at 1–2) and the Answer (ECF No. 18-1 at 1).

On November 1, 2017, a Contra Costa County jury convicted Petitioner of false imprisonment of an elder under California Penal Code § 368(f); elder abuse likely to cause great bodily injury under California Penal Code § 368(b)(1); and use of force to resist an executive officer under California Penal Code § 69.

Petitioner appealed to the California Court of Appeal, Case No. A153882, which affirmed the judgment against Petitioner on May 23, 2019.  On July 31, 2019, the California Supreme Court denied Petitioner's petition for review.

On February 12, 2020, Petitioner filed a petition for writ of habeas corpus in Contra Costa County Superior Court (the "Superior Court"), which the Superior Court denied on May 20, 2020. *See* Amended Petition, ECF No. 8, Ex. D.  Petitioner filed a petition for writ of habeas corpus in the California First Appellate District (the "State Appellate Court"), Case No. A160499.  The State Appellate Court ordered that the issue be informally briefed.  On September 2, 2020, the State Appellate Court denied the petition.  *See* Amended Petition, ECF No. 8, Ex. C.  The California Supreme Court denied review on October 21, 2020.

On March 5, 2020, Petitioner filed a petition for writ of habeas corpus in this Court.  *See* Petition, ECF No. 1.  On March 11, 2020, the case was stayed so that Petitioner could fully exhaust his state court claims.  *See* ECF No. 6.  On February 12, 2020, after moving to reopen the case, Petitioner filed an Amended Petition.  *See* Amended Petition, ECF No. 8.  The Amended Petition has been fully briefed and is now before the Court.

## II.   STATEMENT OF FACTS

The following facts, presumed to be correct under 28 U.S.C. § 2254(e), *Brown v. Horell*, 644 F.3d 969, 972 (9th Cir. 2011), are excerpted from the State Appellate Court's decision on May 23, 2019 affirming the Superior Court's judgment of Petitioner:

United States District Court
Northern District of California

In July 2017, 50-year-old Hawks lived in El Cerrito with his mother, who was in her mid-seventies, and his father, who was in his early eighties. A neighbor testified that on July 9, she was unloading groceries when she heard yelling from the Hawks house. Although it was normal for her to hear Hawks "yelling randomly to himself," she became concerned when she heard his mother yelling as well. The neighbor called 911 after she "heard [Hawks] say very clearly, 'Do you want to get hurt?'"

Five El Cerrito police officers soon arrived at the Hawks residence. The police considered a heightened response appropriate because they had been called to the house a few months earlier due to a fight between Hawks and his father, after which guns were seized and Hawks was detained for a psychiatric evaluation under Welfare and Institutions Code section 5150.  [FN1]

> FN1.  The jury acquitted Hawks of a count of misdemeanor elder abuse charged as a result of this earlier incident.

Hawks's mother, who was five feet, three inches tall and about 130 pounds at the time, answered the door for the police. Due to an old accident, she had nerve damage and limited mobility in her lower body, and she had also had surgery on both arms. She appeared "emotional, distraught," and "scared," but before the officers could question her, Hawks, who was about six feet tall and over 200 pounds, intervened and became "very abrasive and . . . confrontational." Hawks's mother came outside at the officers' request, and after briefly talking to her they decided to arrest him.

As three police officers moved inside, Hawks ran upstairs. One of the officers grabbed him, and Hawks turned and kicked him. Another officer deployed his taser against Hawks, hitting him in the chest, and Hawks ripped the wires from the taser prongs. Hawks kept struggling while on the ground, but the officers were eventually able to restrain and arrest him.

After the arrest, one of the police officers interviewed Hawks's mother, and a recording of her statement was played for the jury. She told the officer that Hawks had become angry when she told him to move his telephone from the kitchen so it would not get wet. He began yelling at her and pushed her, cornering her in the kitchen. She told him to "stop barking like a dog" and threatened to call the police, at which point he told her, "I'm going to shut your mouth." He then broke a piece of cardboard off of a box nearby and tried to stuff it in her mouth. She indicated that his hands were pushing against her neck and face, pinning her down, and he was "grabbing so hard" onto her forearm while his elbow was "digging into her right breast." She estimated that he held her down for "five to ten minutes," during which she repeatedly told him to get off her and tried to bite his hand. Eventually, Hawks let her go and left the room.

After Hawks's mother gave her statement, another police officer took photographs of her injuries. This officer testified that Hawks's mother said "she was in pain" and indicated that her forearms and chest hurt. Hawks's mother had trouble rolling up her sleeves because her forearms were sore, and the officer described her

arms as being "saturated with bruises," including a distinct thumbprint. The officer also observed bruising near Hawks's mother's upper breast and on her biceps. Hawks's mother said that her son caused these injuries.

The testimony Hawks's mother gave at trial was consistent in many respects with her statement to police, except that she said Hawks held her down less than a minute, and she suggested she had "exaggerate[d]" when describing her level of pain. She also said she did not believe Hawks was "trying to hurt [her]" because despite his great strength, he had caused only "a teeny weeny bruise." [FN2]

> FN2.  There is some indication in the record that Hawks's mother downplayed the incident in part because of Hawks's father, who returned home as Hawks's mother finished giving her statement to the police. One of the police officers testified that Hawks's father was "hostile toward the officers," tried to talk over his wife and "control the officers' actions," and ordered the officers to leave.

The jury convicted Hawks of false imprisonment of an elder, elder abuse likely to cause great bodily injury, and use of force to resist an executive officer. [FN3] The trial court placed him on probation, reporting to Behavioral Health Court, on the condition that he serve 364 days in jail.

> FN3.  The convictions were under Penal Code sections 69 (use of force to resist executive officer) and 368, subdivisions (b)(1) (elder abuse likely to produce great bodily harm) and (f) (false imprisonment of elder). All further statutory references are to the Penal Code.

Original Petition, ECF No. 1, Ex. A at 1–3.

## III.   LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In addition, the federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and

convincing evidence.   28 U.S.C. § 2254(e)(1); *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019).   When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d).   *Ylst v. Nunnemaker*, 501 U.S. 797, 801–06 (1991).

The U.S. Supreme Court has made clear that § 2254(d)(1) consists of two distinct clauses. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13.   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.   It is important, however, that a federal court not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."   *Id*. at 411.   The pertinent question is whether the state court's application of clearly established federal law was "objectively unreasonable."   *Id*. at 409.

For the purposes of both clauses, "clearly established Federal law" consists of Supreme Court holdings (not dicta) existing at the time of the relevant state court decision, because only the Supreme Court's holdings are binding on the state courts.   *See id*. at 412.   Circuit law may nevertheless be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent.   *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

As apparent from the foregoing, the AEDPA sets forth a highly deferential standard for evaluating state court rulings:   It requires a state prisoner to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Moreover, even if a petitioner establishes a constitutional violation under the relevant standard, that is only the first hurdle the petitioner must clear. "[H]abeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quotation marks and citations omitted). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 267–68 (internal quotations omitted).

With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

## IV.    DISCUSSION

### A.    Claim 1:  Insufficient Evidence

Petitioner's first habeas claim asserts that there was insufficient evidence to support his convictions for (1) false imprisonment of an elder and (2) elder abuse likely to cause great bodily injury. *See* Amended Petition, ECF No. 8 at 15–23. The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id*. at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings...." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843

United States District Court
Northern District of California

(1993); *see, e.g., Coleman*, 566 U.S. at 656 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992–93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

In sum, sufficiency claims on federal habeas review are subject to a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam). First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quoting *Jackson*, 443 U.S. at 319). Second, a state court decision denying a sufficiency challenge may not be overturned on federal habeas unless the decision was "objectively unreasonable." *Id*. (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).

### 1. False Imprisonment of an Elder

Petitioner asserts that the State Appellate Court unreasonably rejected his challenge to his felony false imprisonment of an elder conviction, because there was insufficient evidence at trial that Petitioner used violence, menace, fraud, or deceit in falsely imprisoning Ms. Hawks. *See* Amended Petition, ECF No. 8 at 16–19. Under California Penal Code § 368(f), false imprisonment of an elder or a dependent adult "by the use of violence, menace, fraud, or deceit" is a felony. *See* Cal. P.C. § 368(f); *see also* Cal. P.C. § 237(b). "Elder" means a person who is 65 years of age or older. *See* Cal. P.C. § 368(g). False imprisonment requires physical restraint of someone. *See* *People v. Bamba*, 58 Cal.App.4th 1113, 1121 (1997). Violence means that "the force used is greater than that reasonably necessary to effect the restraint." *See People v. Dominguez*, 180 Cal.App.4th 1351, 1357 (2010). Menace means "a threat of harm express or implied by word

or act." *People v. Newman*, 238 Cal.App.4th 103, 109 (2015).  Absent the use of violence, menace, fraud, or deceit, false imprisonment is a misdemeanor.  *See* Cal. P.C. § 237(a).

On direct appeal to the State Appellate Court, Petitioner argued that there was insufficient evidence that he used violence or menace to falsely imprison Ms. Hawks.  The State Appellate Court rejected Petitioner's claim, reasoning as follows:

> Hawks contends that his conviction for false imprisonment must be reduced to a misdemeanor because there is insufficient evidence he used violence or menace to perpetrate the crime. "False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) False imprisonment perpetrated against a person 65 years of age or older "by the use of violence . . . [or] menace" is a felony. (§ 368, subds. (f), (g); see § 237, subd. (b).) """Force is an element of both felony and misdemeanor false imprisonment,""" and the crime constitutes a felony based on the use of violence """only where the force used is greater than that reasonably necessary to effect the restraint.""" (*People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1357.) """Menace [for false imprisonment] is a threat of harm express or implied by words or act.""" (*People v. Newman* (2015) 238 Cal.App.4th 103, 121.)
>
> Hawks conclusorily asserts that he did not use any more force than was necessary to effect the restraint of his mother, or in his words to "confine [his mother] to an area of the kitchen." We agree with the Attorney General, however, that there was substantial evidence Hawks used more force than was necessary merely to restrain his mother. His hold was strong enough to inflict severe bruising, and he dug his elbow into her upper breast, causing pain.
>
> Hawks also claims "there is no evidence that [he] used either a weapon or verbal threats to confine [his mother]," even though he both asked her whether she wanted to get hurt and told her he was going to shut her mouth. We find it hard to understand how these statements did not amount to verbal threats of harm. In any case, "[a]n express or implied threat of harm does not require the use of a deadly weapon or an express verbal threat to do additional harm," and we conclude that Hawks's statements and actions amounted at the very least to an implied threat of inflicting harm that constituted the use of menace to effect the false imprisonment. (*People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1513.) Thus, there was substantial evidence that Hawks used both violence and menace to perpetrate the false imprisonment.

Original Petition, ECF No. 1, Ex. A at 4–5.

Petitioner argues that the State Appellate Court's finding of substantial evidence of violence and menace was an unreasonable application of the law to the facts of the case.  *See* Amended

8

Petition, ECF No. 8 at 17–19.

With respect to violence, Petitioner argues that the only direct evidence of the false imprisonment came from Ms. Hawks, and her testimony indicates that Petitioner did not use any force beyond what was necessary to restrain Ms. Hawks. *See id.* at 17–18. Specifically, Petitioner points out that Ms. Hawks testified only that Petitioner placed his elbow against her breast in pushing her against the breakfast nook, and that Petitioner did not physically hurt her. *See id.*

With respect to menace, Petitioner argues that neither of the State Appellate Court's bases for its finding of menace was sufficient. *See* Amended Petition, ECF No. 8 at 18–19. First, Petitioner points out that the State Appellate Court relied on a neighbor's testimony that she heard Petitioner yell at Ms. Hawks, "[D]o you want to get hurt." *See id.* at 18; Original Petition, ECF No. 1, Ex. A at 5. Petitioner argues that there was no evidence that the statement was made during the false imprisonment, since the neighbor could not see what was going on in the house at the time of the statement. *See* Amended Petition, ECF No. 8 at 18. Second, Petitioner points out that the State Appellate Court relied on Petitioner's statement that he was going to shut Ms. Hawks's mouth. *See* Amended Petition, ECF No. 18–19; Original Petition, ECF No. 1, Ex. A at 5. Petitioner argues that this statement is not a specific threat of physical harm, since there is no evidence that shutting Ms. Hawks's mouth would cause her pain or injury. *See* Amended Petition, ECF No. 8 at 18–19. Petitioner argues that the evidence supports the inference that Petitioner merely meant that he would prevent Ms. Hawks from barking or howling—not that he would physically harm her. *See id.* at 19; Reply, ECF No. 22-1 at 2.

In response, Respondent argues that the State Appellate Court's finding of substantial evidence of violence and menace was not objectively unreasonable. With respect to violence, Respondent argues that it was not unreasonable for the State Appellate Court to find that Petitioner used more force than necessary to restrain Ms. Hawks, since there was evidence that Ms. Hawks had severe bruising on her arm and pain to her chest. *See* Answer, ECF No. 18-1 at 6. With respect to menace, Respondent argues that it was not unreasonable for the State Appellate Court to find that Petitioner impliedly, if not explicitly, threatened Ms. Hawks with physical harm. *See id.* at 6–7. Respondent argues that an inference of menace was "particularly reasonable" based on Petitioner's

United States District Court
Northern District of California

statement that he was going to shut Ms. Hawks's mouth given that it followed Ms. Hawks's loud screaming that could be heard by a neighbor.  *See id.* at 7 (citing ECF No. 19-7, 2 Reporter's Transcript ("RT") 209–10).  Further, Petitioner's statement was coupled with his conduct of putting cardboard in her mouth.  *See id.* (citing ECF No. 19-8, 2 RT 274; ECF No. 19, Augmented Clerk's Transcript ("AugCT") 355, 358–59, 366).

The Court agrees with Respondent.  With respect to violence, the State Appellate Court reasonably concluded that there was substantial evidence that Petitioner used more force than necessary to restrain Ms. Hawks, since there was evidence that Petitioner's hold inflicted severe bruising and caused Ms. Hawks pain.  *See* Original Petition, ECF No. 1, Ex. A at 5.  Petitioner argues that the only direct evidence of Ms. Hawks's false imprisonment came from her testimony, and she had testified that petitioner did not physically hurt her.  *See* Amended Petition, ECF No. 8 at 17.  But even if Ms. Hawks's testimony were the only "direct evidence" of false imprisonment, it was not the only evidence of injuries resulting from the false imprisonment that the State Appellate Court pointed to.  A police officer took photographs of Ms. Hawks's injuries after the false imprisonment and testified that Ms. Hawks said "she was in pain," that her forearms were sore, and that she was "saturated with bruises," including on her upper breast where Ms. Hawks testified Petitioner had placed his elbow.  *See* Original Petition, ECF No. 1, Ex. A at 3.  Based on these facts, the Court finds that Petitioner has not shown that the State Appellate Court's conclusion—that there was substantial evidence that Petitioner used violence to effect the false imprisonment—was an objectively unreasonable application of the law to the facts.

With respect to menace, the Court further agrees with Respondent.  The State Appellate Court concluded that Petitioner's statement that he was going to shut Ms. Hawks's mouth was at least an implied threat, including based on his "statements and actions."  *See* Original Petition, ECF No. 1, Ex. A at 5.  In its recitation of the factual background, the State Appellate Court found that there was evidence that Petitioner and Ms. Hawks had been screaming just before Petitioner's statement that he was going to shut Ms. Hawks's mouth.  *See* Original Petition, ECF No. 1, Ex. A at 1–2.  Further, the State Appellate Court found that there was evidence that Petitioner had stuffed cardboard into Ms. Hawks's mouth after the threat.  *See id.* at 2.  An implied threat is sufficient to

10

1    constitute menace under California law, and it can be manifested "verbally and by conduct." *See*

2    *People v. Aispuro*, 157 Cal.App.4th 1509, 1513 (2007).

3            Petitioner appears to cite to two cases to argue that Petitioner's statement—that he was going

4    to shut Ms. Hawks's mouth—was less serious than the kinds of threats California courts have

5    recognized.   Petitioner points to two cases where California courts found snapping a belt and

6    explicitly threatening to kill the victim were sufficient to establish menace. *See* Amended Petition,

7    ECF No. 8 at 18–19 (citing *People v. Raley*, 2 Cal.4th 870, 907 (1992); *People v. Magana*,

8    230 Cal.App.3 1117 (1991)).   But these cases fail to move the needle in light of authority that

9    "[t]hreats can be exhibited in a myriad number of ways," including without "the use of a deadly

10   weapon or an express verbal threat to do additional harm[.]" *Aispuro*, 157 Cal.App.4th at 1513.

11           Petitioner further argues that there was no evidence that shutting Ms. Hawks's mouth would

12   cause her pain or injury.  *See* Amended Petition, ECF No. 8 at 19.  Perhaps there was no direct

13   evidence that shutting Ms. Hawks's mouth would cause her pain or injury.  Nonetheless, the Court

14   finds that the State Appellate Court was not unreasonable in finding that Petitioner was making at

15   least an implied threat when he said that he would shut Ms. Hawks's mouth. *See* Original Petition,

16   ECF No. 1, Ex. A at 5.   Based on the seemingly common-sense inference linking the threat of

17   shutting someone's mouth to resulting pain or injury, particularly under the factual circumstances

18   found by the State Appellate Court, *see* Original Petition, ECF No. 1, Ex. A at 1–2, the Court finds

19   that the State Appellate Court's finding of an implied threat was not unreasonable.

20           Accordingly, the Court finds that Petitioner fails to show that the State Appellate Court's

21   conclusion that there was substantial evidence of the use of menace to perpetrate the false

22   imprisonment was an objectively unreasonable application of the law to the facts.

23                                              * * *

24           Based on the above reasoning, the Court finds that it was not objectively unreasonable for

25   the State Appellate Court to find that there was substantial evidence that Petitioner used violence or

26   menace to perpetrate the false imprisonment.  Accordingly, after viewing the evidence in the light

27   most favorable to the Prosecution, the Court finds that the State Appellate Court's rejection of

28   Petitioner's arguments as to the felony false imprisonment claim was not unreasonable.  *See*

United States District Court
Northern District of California

1

*Jackson*, 443 U.S. at 324.

2

### 2.   Elder Abuse Likely to Cause Great Bodily Harm

3

Petitioner asserts that the State Appellate Court's finding that there was substantial evidence

4

to support his conviction for felony elder abuse likely to cause great bodily harm was an

5

unreasonable application of the law to the facts, because there was insufficient evidence at trial of a

6

likelihood to cause great bodily harm.  *See* Amended Petition, ECF No. 8 at 19–23.  Under

7

California Penal Code § 368(b)(1), a person commits elder abuse "who knows or reasonably should

8

know that a person is an elder or dependent adult and who, under circumstances or conditions likely

9

to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to

10

suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or

11

custody of any elder or dependent adult, willfully causes or permits the person or health of the elder

12

or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be

13

placed in a situation in which his or her person or health is endangered[.]"  Without a likelihood to

14

cause great bodily harm, elder abuse is a misdemeanor.  *See* Cal. P.C. § 368(c).

15

Petitioner claimed before the State Appellate Court that there was insufficient evidence for

16

the jury to have concluded that he used force likely to cause great bodily injury against Ms. Hawks.

17

*See* Amended Petition, ECF No. 8 at 20.  The State Appellate Court rejected Petitioner's claim on

18

direct appeal, holding as follows:

19

20

> Hawks claims his conviction for elder abuse must also be
> reduced to a misdemeanor, because there was insufficient evidence

21

> he acted in a way likely to produce great bodily injury. He was
> convicted under section 368, subdivision (b)(1), which makes it a

22

> felony for "[a] person who knows or reasonably should know that a
> person is an elder or dependent adult" to, "under circumstances or

23

> conditions likely to produce great bodily harm or death, willfully
> cause[] or permit[] any elder or dependent adult to suffer, or inflict[]

24

> thereon unjustifiable physical pain or mental suffering."

25

> Hawks premises his claim on distinctions between the facts
> here and those in *People v. Thiel* (2016) 5 Cal.App.5th 1201 (*Thiel*),

26

> in which the Fourth District Court of Appeal held that substantial
> evidence supported the finding that the defendant "inflicted

27

> 'unjustifiable physical pain' on [his 91-year-old aunt] under
> 'circumstances or conditions likely to produce great bodily harm or

28

> death.'" (*Id.* at pp. 1204, 1217.) In that case, after smashing a framed

United States District Court
Northern District of California

picture, the defendant "forcefully grabbed [his aunt] by both wrists" and pulled her to the floor from the chair in which she had been sitting. (*Id.* at p. 1205.) There was evidence that the defendant then "'forcefully' picked [his aunt] up from the floor, after she had fallen to one knee . . . ; that when [he] forcibly grabbed [her], he broke her wrist and 'tore the skin on [her] arms,' causing her substantial physical injury that required extensive medical treatment; and that [he] intentionally pushed [her] back into her chair about six times, . . . which caused [her] to fall." (*Id.* at p. 1217.)

Hawks claims that in contrast to the Thiel defendant, he only "held his mother for a short, undetermined period of time and . . . her injuries consisted of bruises but did not include any broken bones or lasting injuries that required medical treatment." But as the Attorney General correctly points out, "there is no requirement that the victim actually sustain great bodily injury, or any injury." (Citing *People v. Clark* (2011) 201 Cal.App.4th 235, 245, fn. 6 (*Clark*).) *Clark*, which addressed the child-abuse statute that section 368 "is patterned on and virtually identical to," identified factors a factfinder may consider in determining whether abuse was "inflicted under circumstances or conditions likely to produce great bodily injury." (*Id.* at pp. 244-245 & fn. 5.) These "include, but are not limited to, (1) the characteristics of the victim and the defendant, (2) the characteristics of the location where the abuse took place, (3) the potential response or resistance by the victim to the abuse, (4) any injuries actually inflicted, (5) any pain sustained by the victim, and (6) the nature of and amount of force used by the defendant." (*Id.* at p. 245, fn. Omitted.) Thus, while the extent of a victim's actual injuries is a relevant factor, the victim need not sustain any injury at all if other factors are present.

Viewing the evidence here in light of the *Clark* factors, we have no trouble concluding there was substantial evidence that Hawks attacked his mother under circumstances likely to produce great bodily injury. The evidence showed that his mother was physically disabled and of small stature, whereas he was physically large and strong enough that it took several police officers to subdue him. And although Hawks may not have inflicted lasting physical injuries on his mother, there was evidence that she experienced significant bruising and pain, particularly on her arms, to the point that she found it difficult to push up her sleeves. In addition, under these circumstances, the jury could have reasonably found that Hawks inflicted a level of force likely to make his mother fall which, given his mother's physical limitations and relatively advanced age, involved "an increased risk of bone fractures." (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1333 [affirming felony elder-abuse conviction where defendant's chasing and pushing of 74-year-old victim could have caused victim to fall].) Substantial evidence supported this conviction as well.

Original Petition, ECF No. 1, Ex. A at 5–7.

Petitioner argues that the State Appellate Court unreasonably applied clearly established constitutional law to the facts of the case. *See* Amended Petition, ECF No. 8 at 20.  First, Petitioner

argues that the State Appellate Court improperly relied on the *Clark* case (*People v. Clark*, 201 Cal.App.4th 235 (2011)), which involved a charge of felony child abuse under California Penal Code § 273(a)—not a count of elder abuse.  *See id.*  Further, Petitioner argues that even though the *Clark* court found that the factors arose from two cases involving elder abuse—*People v. Racy*, 148 Cal.App.4th 1327, 1334–35 (2007) and *People v. Sargent*, 19 Cal.4th 1206 (1999)—those cases did not themselves enumerate those factors.  *See id.*

Second, Petitioner argues that even if the State Appellate Court correctly applied *Clark* to a case involving elder abuse, there was nonetheless insufficient evidence under the *Clark* factors to indicate that Petitioner used force likely to cause great bodily harm.  *See id.* at 20–21.  As discussed in the State Appellate Court's opinion, *Clark* outlined the following six factors:   "(1) the characteristics of the victim and the defendant, (2) the characteristics of the location where the abuse took place, (3) the potential response or resistance by the victim to the abuse, (4) any injuries actually inflicted, (5) any pain sustained by the victim, and (6) the nature of and amount of force used by the defendant[.]"  *See* Original Petition, ECF No. 1, Ex. A at 6 (citing *Clark*, 201 Cal.App.4th at 245).  Petitioner argues that only two of the six *Clark* factors weighed against him—the (1) characteristics of the victim and the defendant (because of their size difference) and (5) any pain sustained by the victim (because Officer Perez testified that Ms. Hawks told him she had pain on her chest and forearms after the incident).  *See* Amended Petition, ECF No. 8 at 21.  Petitioner argues that the remaining four factors weigh against likelihood of causing great bodily harm.  *See id.*  Petitioner argues that (2) the location (the kitchen of Ms. Hawks's residence); (3) Ms. Hawks's lack of response or resistance; (4) the resulting injuries (only some slight bruising); and (6) the nature and amount of force (Petitioner did not strike Ms. Hawks, knock her down, or use any weapon) indicate that Petitioner did not use force likely to cause great bodily harm.  *See id.*

Third, as he did before the State Appellate Court, Petitioner cites to the *Thiel* case (*People v. Thiel*, 5 Cal.App.5th 1201 (2016)), arguing that the California Court of Appeal found the use of force likely to cause great bodily injury under "starkly different facts" from those presented at trial.  *See* Amended Petition, ECF No. 8 at 21–23.  *Thiel* involved a defendant physically dragging elderly relatives out of their chairs; pushing an elder onto the floor, which broke her wrist and caused

14

physical scarring; and forcing elders into chairs so that they could not call the police.  *See id.* at 22–23.  Petitioner argues that in contrast, the present case involves a brief physical encounter in which Ms. Hawks did not sustain serious bodily injury.  *See id.* at 23.

In response, Respondent argues that the State Appellate Court reasonably found substantial evidence of a use of force likely to cause great bodily harm.  *See* Answer, ECF No. 18-1 at 7–9.  Respondent argues that the State Appellate Court's conclusion was reasonable in light of the significant disparity in the size and strength of Petitioner and the disabled Ms. Hawks; Ms. Hawks's significant bruising; and the likelihood that Petitioner's use of force would cause Ms. Hawks—a woman of advanced age—to fall, risking bone fractures.  *See id.* at 8.  Further, Respondent argues that Petitioner cites no clearly established constitutional law the state court failed to apply, instead arguing that the evidence was insufficient under the "totality of the circumstances"—which is not clearly established constitutional law for determining sufficiency of the evidence.  *See id.* at 8–9.

The Court agrees with Respondent that the State Appellate Court was not objectively unreasonable in finding that there was substantial evidence at trial that Petitioner used force against Ms. Hawks likely to cause great bodily harm.  The State Appellate Court found that there was substantial evidence that Petitioner used force likely to cause great bodily harm given the circumstances of the incident—particularly the size and strength difference between Petitioner and Ms. Hawks; Ms. Hawks's significant bruising; and the risk of Petitioner's use of force causing Ms. Hawks to fall and fracture a bone.  *See* Original Petition, ECF No. 1, Ex. A at 7.  The State Appellate Court based its finding on the *Clark* decision, which indicated that the circumstances and conditions of a use of force could support a finding that the force was likely to cause great bodily harm.  *See id.* at 5.  The State Appellate Court also cited the six factors outlined in *Clark* for courts to consider in determining whether the circumstances and conditions of a use of force indicated that it was likely to cause great bodily harm.  *See id.* at 6.  The State Appellate Court also cited the *Racy* case, where a California Appeals Court affirmed a felony elder abuse conviction where defendant's conduct could have caused the elderly victim to fall.  The State Appellate Court additionally rejected Petitioner's argument regarding the *Thiel* decision, finding based on *Clark* and *Racy* that courts have found a use of force likely to cause great bodily harm even where no injury was sustained, but the

United States District Court
Northern District of California

1 circumstances still supported a likelihood of great bodily harm.  *See id.* at 6.

2      Petitioner argues that the evidence was not sufficient to support a finding of felony elder

3 abuse under the *Clark* factors.  *See* Amended Petition, ECF No. 8 at 20–21.  Petitioner concedes

4 that two of the *Clark* factors—the characteristics of Ms. Hawks and Petitioner and any pain

5 sustained by Ms. Hawks—support a finding of force likely to cause great bodily harm.  *See id.* at 21.

6 But Petitioner argues that the other four *Clark* factors weigh against such a finding.  *See id.*  The

7 Court finds that it was not unreasonable for the State Appellate Court to conclude that a reasonable

8 jury could find that *more* than just two *Clark* factors support a finding of force likely to cause great

9 bodily harm.  For example, the State Appellate Court pointed to evidence that Ms. Hawks sustained

10 injuries in the form of substantial bruising.  *See* Original Petition, ECF No. 1, Ex. A at 7.  Further,

11 the State Appellate Court pointed to evidence relating to the nature and amount of force used.  The

12 State Appellate Court noted that "Hawks inflicted a level of force likely to make his mother fall,"

13 which came with an increased risk of bone fractures.  *See id.*  Accordingly, it was not unreasonable

14 for the State Appellate Court to conclude that there was substantial evidence of force likely to cause

15 great bodily harm, since the State Appellate Court cited evidence supporting at least *four* of the six

16 *Clark* factors—not just the two factors Petitioner concedes.  Further, Petitioner points to no authority

17 to support the proposition that a particular number or set of *Clark* factors must support a finding of

18 force likely to cause great bodily harm.

19      Petitioner also argues that the State Appellate Court improperly applied the *Clark* factors to

20 his case, since *Clark* involved felony child abuse—not felony elder abuse—and the felony elder

21 abuse-related cases cited in *Clark* did not establish any factors for determining whether a defendant

22 used force likely to cause great bodily harm.  *See* Amended Petition, ECF No. 8 at 20.  The Court

23 finds that Petitioner fails to show that the State Appellate Court's application of the *Clark* factors

24 was unreasonable.  The State Appellate Court explicitly cited the *Clark* opinion's reference to the

25 fact that the felony elder abuse statute—California Penal Code § 368—"is patterned on and virtually

26 identical to" the child-abuse statute at issue in *Clark*—California Penal Code § 273(a).  *See* Original

27 Petition, ECF No. 1, Ex. A at 6.  Petitioner fails to show that it was unreasonable for the State

28 Appellate Court to rely on the *Clark* factors given this statutory similarity between the felony child

16

abuse and felony elder abuse statutes.

Further, even if Petitioner had succeeded in showing that it was unreasonable for the State Appellate Court to apply the *Clark* factors, the State Appellate Court's finding that there was substantial evidence that Petitioner used force likely to cause great bodily harm would not have been unreasonable based on the two cases cited by *Clark—Racy* and *Sargent*—which, Petitioner concedes, "involve[ed] elder abuse." *See* Amended Petition, ECF No. 8 at 20; *Clark*, 201 Cal.App.4th at 244–45. Both *Racy* and *Sargent* stand for the proposition that the circumstances and conditions of a defendant's use of force are relevant to determining whether it was likely to cause great bodily harm. *See Sargent*, 19 Cal.4th at 1216 n.6 ("Section 368 was patterned on and is virtually identical to section 273a. Cases interpreting one section are therefore appropriately used to interpret the other."); *Racy*, 148 Cal.App.4th at 1334–35. Even without the *Clark* factors, it would not have been unreasonable for the State Appellate Court to conclude that there was substantial evidence to support that Petitioner's use of force against Ms. Hawks was likely to cause great bodily harm. Based on the evidence that the State Appellate Court cites in support of its finding—the evidence of Ms. Hawks's significant bruising and pain following Petitioner's use of force; the difference in size and strength between Petitioner and Ms. Hawks; and the risk of the use of force causing the elderly Ms. Hawks to fall and fracture a bone—the State Appellate Court reasonably concluded that a rational factfinder could have concluded beyond a reasonable doubt that the circumstances and conditions surrounding the Petitioner's use of force indicated a likelihood of great bodily harm to Ms. Hawks.

Petitioner further argues that it was unreasonable for the State Appellate Court to conclude there was substantial evidence that Petitioner used force likely to cause great bodily harm to Ms. Hawks in light of the *Thiel* case, which involved significant injuries to multiple elderly individuals. *See* Amended Petition, ECF No. 8 at 21–22. The State Appellate Court directly addressed the *Thiel* case, finding based on *Clark* that "there is no requirement that the victim actually sustain great bodily injury, or any injury." *See* Original Petition, ECF No. 1, Ex. A at 6. Based on the Court's reasoning regarding *Clark* above, the Court finds that the State Appellate Court was not unreasonable in finding that *Thiel* did not show that there was insufficient evidence to support

1    Petitioner's felony elder abuse conviction.  Rather, even in cases without actual injury like in *Thiel*,

2    it was not unreasonable for the State Appellate Court to conclude based on *Clark* that there could

3    still be substantial evidence of force likely to cause great bodily harm.  Further, the Court notes that

4    just because a court found evidence of *more* severe conduct to be *sufficient* to support a felony elder

5    abuse conviction, that does not mean that *less* severe conduct is *insufficient* to supporting such a

6    conviction.  Accordingly, the Court finds that *Thiel* does not show that the State Appellate Court's

7    rejection of Petitioner's insufficient evidence claim as to his felony elder abuse conviction was

8    unreasonable.

9         Based on the above reasoning, the Court finds that it was not objectively unreasonable for

10   the State Appellate Court to find that there was substantial evidence that Petitioner used force likely

11   to cause great bodily harm against Ms. Hawks.  Accordingly, after viewing the evidence in the light

12   most favorable to the Prosecution, the Court finds that the State Appellate Court's rejection of

13   Petitioner's arguments as to the felony elder abuse claim was not unreasonable.  *See Jackson*,

14   443 U.S. at 324.

15                                              * * *

16        Since the Court finds that it was not unreasonable for the State Appellate Court to reject

17   Petitioner's insufficient evidence claim as to the felony elder abuse or false imprisonment of an

18   elder counts, the Court hereby DENIES Petitioner's first habeas claim.

19        **B.     Claim 2:  Failure to Turn Over Exculpatory Evidence**

20        In his habeas petitions before the Superior Court and the State Appellate Court, Petitioner

21   brought a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), arguing that the prosecutor in the

22   trial court (the "Prosecutor") suppressed material evidence in the form of a piece of video footage

23   (the "Video Footage") depicting Petitioner's arrest taken by a video surveillance system in

24   Petitioner's house.  In *Brady*, the Supreme Court held that "the suppression by the prosecution of

25   evidence favorable to an accused upon request violates due process where the evidence is material

26   either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*,

27   373 U.S. at 87.  In sum, for a *Brady* claim to succeed, petitioner must show:  (1) that the evidence

28

at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused. *See United States v. Agurs*, 427 U.S. 97, 107 (1976).

The Superior Court and State Appellate Court rejected Petitioner's claim, citing in part the fact that Petitioner's *Brady* claim was procedurally barred because it was not raised on direct appeal. *See* Amended Petition, ECF No. 8, Exs. C, D. In rejecting Petitioner's *Brady* claim, the State Appellate Court found as follows:

> The petition for writ of habeas corpus is denied. (*Briggs v. Brown* (2017) 3 Cal.5th 808, 841 ["The courts themselves have developed a number of 'procedural bars' in an attempt to put reasonable limits on collateral attacks by way of habeas corpus. [Citation.] These include a long-established rule that habeas corpus may not be employed as a substitute for appeal . . . by raising claims that could have been but were not raised on appeal . . . ."]; *In re Harris* (1993) 5 Cal.4th 813, 829 ["Proper appellate procedure thus demands that, absent strong justification, issues that could be raised on appeal must initially be so presented, and not on habeas corpus in the first instance. Accordingly, an unjustified failure to present an issue on appeal will generally preclude its consideration in a postconviction petition for a writ of habeas corpus."].)
>
> Even if the petition were not barred, it fails to state a prima facie case as petitioner has not established that the video in question was "suppressed" within the meaning of *Brady v. Maryland* (1963) 373 U.S. 83. (See *People v. Zaragoza* (2016) 1 Cal.5th 21, 52 ["Defendant has failed to establish that the prosecution, by alerting him to the existence of the videotape and by making it available for him to view at the Jack in the Box, suppressed any information."]; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1134–1135 [prosecutor's Brady obligation may, under proper circumstances, be satisfied when defense counsel is free to examine all materials regarding the case that are in the prosecutor's possession], disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Morrison* (2004) 34 Cal.4th 698, 715 ["'[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable

1

diligence, the defendant has no Brady claim.'"].)

2

Court of Appeal Decision, attached to Amended Petition, ECF No. 8, Ex. C at 1–2.

3

Petitioner now argues that the State Appellate Court's rejection of his claim that the

4

Prosecutor violated *Brady* in failing to provide Petitioner with the Video Footage represented an

5

unreasonable application of clearly established law.  *See* Amended Petition, ECF No. 8 at 23–36.

6

Petitioner raises two arguments in support.  *See id.*  First, Petitioner argues that the State Appellate

7

Court did not have an independent and adequate state law ground to procedurally bar Petitioner's

8

*Brady* claim.  *See* Amended Petition, ECF No. 8 at 33–36.  Second, Petitioner argues that even if

9

the State Appellate Court had an adequate state law ground to find Petitioner's *Brady* claim

10

procedurally barred, an exception applies under *Coleman v. Thompson*, 501 U.S. 722 (1991) because

11

Petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged

12

violation of federal law, or demonstrate that failure to consider the claims will result in a

13

fundamental miscarriage of justice."  *See* Reply, ECF No. 22-1 at 3–5 (citing *Coleman*,

14

501 U.S. at 729).  The Court will consider each issue in turn.

15

### 1.  Whether the State Appellate Court Had an Independent and Adequate State Law Ground for Denying Petitioner's *Brady* Claim

16

Petitioner first argues that the State Appellate Court did not have an independent and

17

adequate state law ground for denying his *Brady* claim.  *See* Amended Petition, ECF No. 8 at 34–36.

18

Petitioner's challenge focuses on the "adequate" requirement.  A district court will not review a

19

question of federal law decided by a state court if the decision of that court rests on a state law

20

ground that is independent of the federal question and adequate to support the judgment.  *Coleman*,

21

501 U.S. at 729.  This rule applies whether the state law ground is substantive or procedural.  *Id.*  A

22

state procedural default is independent unless it appears "to rest primarily on federal law or appears

23

to be interwoven with federal law."  *Id.* at 734.  A state procedural default is adequate if it is "'firmly

24

established and regularly followed' by the time as of which it is to be applied."  *Tong Xiong v.*

25

*Felker*, 681 F.3d 1067, 1075 (9th Cir. 2012) (quoting *Ford v. Georgia*, 498 U.S. 411, 424 (1991)).

26

Petitioner argues that the State Appellate Court's decision that Petitioner defaulted his *Brady*

27

claim by not raising it on appeal was not an adequate state ground to procedurally bar his claim,

28

United States District Court
Northern District of California

because Petitioner was not able to support his *Brady* claim with citations to the trial record, since he did not obtain the Video Footage until after trial. *See id.* Petitioner argues that accordingly, he could not show the prejudice or suppression elements of a *Brady* violation on appeal, so his *Brady* claim would have been "purely speculative," and it would have violated the California Rules of Court. *See id.*; *United States v. Lopez-Alvarez*, 970 F.2d 583, 598 (9th Cir. 1992); California Rules of Court § 8.204(a)(1)(C).

In response, Respondent argues that the Supreme Court has already held that California's "*Dixon*" bar—the procedural bar against raising issues for the first time in a habeas petition that could have been raised on appeal—is an "adequate" state law ground for barring federal habeas review, since it is "firmly established and regularly followed." *See* Answer, ECF No. 18-1 at 10 (citing *Johnson v. Lee*, 578 U.S. 605, 608–11 (2016)). Further, Respondent argues that state court administrative rules about the necessity of record cites is not relevant to the adequacy of the State Appellate Court's determination. *See id.* Additionally, Respondent argues that this Court cannot revisit the issue of whether the procedural bar was properly imposed, since it is a question of state law. *See id.*

The Court agrees with Respondent that the State Appellate Court's determination that Petitioner's *Brady* claim was barred because it was not raised on appeal is an independent and adequate ground to support the State Appellate Court's judgment. Petitioner does not challenge that the State Appellate Court's finding was independent of federal law. Since the State Appellate Court based its *Dixon* bar finding on two California Supreme Court decisions, and there is no indication that the State Appellate Court's decision "rest[ed] primarily on federal law or appears to be interwoven with federal law," the Court finds that the State Appellate Court's judgment was based on an "independent" ground. *See Coleman*, 501 U.S. at 734; Amended Petition, ECF No. 8, Ex. C at 1–2 (citing *Briggs v. Brown*, 3 Cal.5th 808, 841 (2017); *In re Harris*, 5 Cal.4th 813, 829 (1993)).

As to whether the State Appellate Court's judgment was based on an "adequate" ground, the Supreme Court has already held that California's "*Dixon*" bar is an "adequate" state law ground for barring habeas review. *See Lee*, 578 U.S. at 608–11. Petitioner argues that the State Appellate Court's finding of a *Dixon* bar was not an adequate ground for denying his *Brady* claim because

United States District Court
Northern District of California

Petitioner was not able to support his *Brady* claim with citations to the trial record.  *See* Amended Petition, ECF No. 8 at 34–36.  But Petitioner can cite no case authority in which a court found a *Dixon* bar to be an "inadequate" state law ground for denying a *Brady* claim in similar circumstances.  Instead, Petitioner can merely cite to a provision of the California Rules of Court and California case authority requiring parties to support their briefs with citations to the record, along with cases denying "purely speculative" *Brady* claims.  *See id.* (citing, *e.g.*, California Rules of Court § 8.204(a)(1)(C); *Liberty Nat'l Enters., L.P. v. Chicago Title Ins. Co.*, 194 Cal.App.4th 839, 846 (2011); *Lopez-Alvarez*, 970 F.2d at 598).  The Court does not find Petitioner's authority—which outlines requirements for a *party* to adequately raise a *Brady* claim—to have any bearing on whether the State Appellate Court's denial of Petitioner's *Brady* claim was based on an "adequate" state law ground.  *See, e.g.*, *Lee*, 578 U.S. at 608–11.

To the extent Petitioner is arguing that *his* inability to cite to the record renders the State Appellate Court's judgment an "inadequate" state law ground for barring habeas review, Petitioner's authority fails to provide any support.  Petitioner fails to point a single instance in which the *Dixon* bar has been found to be an "inadequate" state law ground in such a circumstance.  *See Lee*, 578 U.S. at 608–11 (state law ground is "adequate" where "firmly established and regularly followed").

Based on the above reasoning, the Court finds that the State Appellate Court found Petitioner's *Brady* claim procedurally barred based on an independent and adequate state law ground.

### 2.  Whether the *Coleman* Exception Applies

Petitioner argues that even if the State Appellate Court's decision was based on an independent and adequate state law ground, the *Coleman* exception provides that Petitioner's *Brady* claim should not be procedurally barred.  *See* Reply, ECF No. 22-1 at 3–6.  In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  When the claim at issue is under *Brady*, the *Coleman* exception

1    applies where a petitioner shows that the second and third elements of a *Brady* claim are satisfied,

2    *i.e.*, that (1) the relevant evidence was suppressed and (2) the relevant evidence is material.  *See*

3    *Martinez v. Ryan*, 926 F.3d 1215, 1217 (9th Cir. 2019).

4          As a threshold matter, Petitioner argues that the Court should not give deference to the State

5    Appellate Court's merits finding—*i.e.*, that the Video Footage was not suppressed—in assessing the

6    applicability of the exception to the procedural bar under *Coleman* and *Martinez*.  *See* Reply,

7    ECF No. 22-1 at 4.  Petitioner argues that the issue of whether an exception applies to the State

8    Appellate Court's procedural bar is one first raised before this Court, so the Court should consider

9    the merits of Petitioner's *Brady* claim *de novo* for purposes of determining the applicability of the

10   exception under *Coleman* and *Martinez*.  *See id.* at 4.  In response, Respondent argues that the State

11   Appellate Court's finding that the Video Footage was not suppressed is entitled to deference.  *See*

12   Answer, ECF No. 18-1 at 11–12.

13         Where a state court dismisses a habeas claim on procedural grounds and considers the merits

14   only on an alternative holding, AEDPA deference applies to the state court's alternative holding on

15   the merits.  *See Clabourne v. Ryan*, 745 F.3d 362, 383 (9th Cir. 2014), *overruled on other grounds*

16   *by McKinney v. Ryan*, 813 F.3d 798, 813 (9th Cir. 2015); *see also Apelt v. Ryan*, 878 F.3d 800, 825

17   (9th Cir. 2017) ("[W]hen a state court 'double-barrels' its decision—holding that a claim was

18   procedurally barred and denying the claim on its merits—both its procedural default ruling and its

19   merits ruling are entitled to deferential review by federal courts, as intended by AEDPA.").

20   However, "while a state court's alternate ruling on the merits . . . does not allow a federal court to

21   ignore a procedural default ruling, it also does not bar a federal court from applying *Martinez* and

22   *Coleman*."  *Apelt*, 878 F.3d at 827.  Accordingly, when faced with a *Martinez* challenge, "a federal

23   court first considers whether the petitioner meets the cause and prejudice standard to overcome

24   procedural default, and then undertakes deferential review of the state court's merits determination

25   of the claim."  *Bradford v. Davis*, 923 F.3d 599, 614 (9th Cir. 2019).

26         Based on Ninth Circuit precedent, the Court agrees with Petitioner in part.  The Court first

27   reviews the merits of Petitioner's habeas claim *de novo* to determine if he has adequately shown

28   cause (*i.e.*, that the Video Footage was suppressed under *Brady*) and prejudice (*i.e.*, that the Video

United States District Court
Northern District of California

Footage was material under *Brady*) such that an exception to the State Appellate Court's procedural bar is warranted under *Coleman* and *Martinez*.  If the Court finds that Petitioner has shown adequate cause and prejudice, then the Court will assess the State Appellate Court's merits findings with deference to determine if the State Appellate Court unreasonably concluded that Petitioner's *Brady* claim fails on the merits.

### a.  Cause:  Whether the Video Footage was "Suppressed"

Petitioner argues that that the Video Footage was "suppressed" under *Brady*.  *See* Amended Petition, ECF No. 8 at 26–29.  As an initial matter, the Court lays out the facts regarding the Video Footage as indicated by the trial record and evidence provided by the parties.  *See* Tully Decl., ECF No. 1, Ex. B; Amended Petition, ECF No. 8 at 9–10; Answer, ECF No. 18–1 at 12–16.

After Petitioner's arrest on July 9, 2017, El Cerrito Police Department officers seized a surveillance system from Petitioner's living room, believing that it may contain evidence of Petitioner's abuse of Ms. Hawks.  *See* ECF No. 19-8, 2 RT 248–49.  The officers did not view any video footage captured by the system.  *See id.*, 2 RT 249.  On that day, Sergeant David Wentworth of the El Cerrito Police Department asked Petitioner if he gave his consent to search the recording devices and Petitioner said, "No."  *See id.*, 2 RT 250–51.

At Petitioner's preliminary hearing on August 7, 2017, police officers testified that on March 15, 2017, they had responded to a report of fighting between Petitioner and his elderly father.  *See* ECF No. 19-1, 1 Clerk's Transcript ("CT") 24, 32.  The officers testified that Petitioner's father had been using a sledgehammer to remove surveillance cameras Petitioner had placed around the house.  *See id.*  Nonetheless, at the end of the preliminary hearing, Petitioner stated on the record that there was a "complete video of all the events that transpired, that hasn't been entered into evidence, that will explain . . . everything that happened during the day" of his arrest.  *See id.*, 1 CT 62.

Prior to trial, Petitioner's trial counsel Joseph Tully sent emails to the Prosecution making informal discovery requests for the Video Footage on August 17, 18, and 30, 2017.  *See* Tully Decl., ECF No. 1, Ex. B ¶ 2.  On September 18, 2017, Mr. Tully filed a motion to compel discovery of the Video Footage.  *See id.*  In response, the Prosecution sent an email on September 18, 2017 indicating

1    that Mr. Tully was "entitled to inspect all real evidence seized in this case and this letter serves as

2    your authorization to do so."  *See* ECF No. 19-9, 3 RT 343:23–27, 348.  On the same day, the

3    Prosecution sent Mr. Tully a consent form giving the Prosecution authorization to search electronics,

4    but Petitioner declined to give consent.  *See id.* at 3 RT 344:3–6.  The motion to compel was denied

5    on September 27, 2017.  *See* ECF No. 19-1, 1 CT 85.

6        Mr. Tully explained on the record that he did not pursue an inspection of the Video Footage

7    at the time because Petitioner indicated in early October that he wanted to represent himself.  *See*

8    ECF No. 19-9, 3 RT 348; ECF No. 19-5, 1 RT 2.  However, the trial court judge pointed out that

9    Mr. Tully "still had the case for weeks and weeks after" the September 18, 2017 email was sent

10   indicating that he could inspect all real evidence.  *See* ECF No. 19-9, 3 RT 348:13–17.  After the

11   trial court granted Petitioner's motion to represent himself on October 23, 2017, *see* ECF No. 19-5,

12   1 RT 68, Mr. Tully was reappointed as Petitioner's counsel on October 25, 2017, *see id.*, 1 RT 147.

13        At the beginning of trial on October 25, 2017, the Prosecutor stated on the record that she

14   did not see in the evidence log that any computer was seized.  *See* ECF No. 19-6,

15   1 RT 180:23–181:5; *see also* Tully Decl., ECF No. 1, Ex. B ¶ 3.  Mr. Tully indicated on the record

16   that the computer at issue "possibly would have captured the PC 69 [resisting arrest] allegation, the

17   events surrounding that."  *See* ECF No. 19-6, 1 RT 181:22–26.  On October 26, 2017, Sergeant

18   Wentworth testified that El Cerrito Police Department officers had seized a computer with a video

19   recording after they arrested Mr. Hawks and that Mr. Tully could arrange with law enforcement to

20   view the evidence.  *See* Tully Decl., ECF No. 1, Ex. B ¶ 3; ECF No. 19-8, 2 RT 249:2–18,

21   255:15–25.  Sergeant Wentworth also testified that the defense had been able to view all evidence

22   in this case since July 9, 2017.  *See* ECF No. 19-8, 2 RT 251:9–15.  Additionally, Sergeant

23   Wentworth testified that he could have attempted to obtain a search warrant to view the Video

24   Footage, but he had not done so.  *See id.*, 2 RT 255:6–14.

25        On October 30, 2017, the parties further discussed the Video Footage on the trial record.

26   *See* ECF No. 19-9, 3 RT 341–351.  Mr. Tully stated, "I know for sure [the Prosecutor] isn't

27   intentionally doing anything to keep me from [the Video Footage]."  *See id.*, 3 RT 341:24–27; *see*

28   *also id.*, 3 RT 342:21–23 (stating that the Prosecutor "personally has done what she's needed to

United States District Court
Northern District of California

do").   Further, Mr. Tully stated that he was "doing everything that [he could]," and that, "[d]epending on how the trial falls," he was "prepared to address" the issue of the Video Footage "in some way."  *See id.*, 3 RT 342:25–343:1.  Mr. Tully also stated that he "will not ask this Court to delay the case so that [he] can run out and look at video."  *See id.*, 3 RT 343:16–17.  The Prosecutor stated that the police had seized a device, but they had not reviewed it because Petitioner had not provided his consent.  *See* ECF No. 19-9, 3 RT 343–44, 347.  Further, the Prosecutor asked on the record, "[H]ow many resources is the little, tiny agency going to expedite [sic] going down a rabbit hole on a surveillance equipment that the dad previously bashed with a sledgehammer."  *See id.*, 3 RT 347:9–12.  The Prosecutor further indicated that "[t]here's no evidence that a video exists.  We're talking about the inspection of a box of a machine of sorts."  *See id.*, 3 RT 349:23–26.

Mr. Tully indicated that he attempted to arrange an appointment with the El Cerrito Police Department to view the Video Footage during trial, but the Department could not accommodate his requests.  *See* Tully Decl., ECF No. 1, Ex. B ¶¶ 4–5.  Petitioner did not receive the Video Footage until after the trial in April 2019, once his new counsel Michael Rooney filed a motion to return the computer and camera system.  *See* Amended Petition, ECF No. 8 at 10.

Petitioner argues that the Video Footage was suppressed under *Brady*, so the first requirement of the *Martinez* test for overcoming the State Appellate Court's procedural bar is satisfied.  *See* Amended Petition, ECF No. 8 at 26–29; Reply, ECF No. 22-1 at 3–5.  First, Petitioner argues that the Prosecutor explicitly denied that the Video Footage existed or that she was in possession of the Video Footage, so Petitioner has shown he was denied access to exculpatory evidence.  *See* Amended Petition, ECF No. 8 at 26, 28.  Second, Petitioner argues that he should not be "deni[ed] . . . his Fourteenth Amendment right to due process" simply because he "held law enforcement to their duty to obtain a warrant before searching his personal property" and law enforcement declined to obtain a warrant so as to "balance their budget."  *Id.* at 27.  Third, Petitioner argues that it cannot be said that he failed to exercise due diligence in obtaining the Video Footage, because his trial counsel attempted to make an appointment with the El Cerrito Police Department to view the Video Footage but the request could not be accommodated.  *See id.* at 28–29.  Petitioner argues that his due diligence is particularly clear in light of the limited options trial counsel had to

United States District Court
Northern District of California

1    view the evidence while continuing to litigate the trial. *See id.* at 29.

2        In response, Respondent argues that the Video Footage was not suppressed under *Brady*.

3    *See* Answer, ECF No. 18-1 at 16–19.  First, Respondent argues that Petitioner had access to the

4    Video Footage during trial and prior to filing his notice of appeal.  *See* Answer, ECF No. 18-1

5    at 16–17.  Respondent argues that any delay in disclosure of the Video Footage resulting from the

6    Prosecution's failure to retrieve the tape first is insufficient for habeas relief, because delayed

7    disclosure is not a proper basis for a *Brady* claim.  *See id.* at 17.  Second, Respondent argues that

8    Petitioner's failure to retrieve the Video Footage does not excuse his procedural default, because he

9    could have obtained the Footage through the exercise of diligence.  *See id.* at 17–19.

10       The Court agrees with Respondent.  Petitioner knew of the Video Footage well before trial.

11   Petitioner indicated on the record that the Video Footage existed and was potentially exculpatory as

12   early as August 7, 2017—weeks before trial started.  *See* ECF No. 19-1, 1 CT 62:9–15; *Cunningham*

13   *v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013) (no suppression where defense attorneys "possessed

14   the 'salient facts' that would have allowed them to access" the evidence at issue in *Brady* claim)

15   (quoting *Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006)); *Reiger v. Christensen*, 789 F.2d 1425,

16   1432 (9th Cir. 1986) ("We have found no *Brady* violation stemming from the government's delay

17   in disclosure in situations where defense counsel was made aware of the exculpatory evidence well

18   before trial.").  Even if the existence of the Video Footage had been in doubt, Sergeant Wentworth's

19   trial testimony confirmed on the second day of trial that the El Cerrito Police Department had seized

20   a computer with a video recording.  *See* Tully Decl., ECF No. 1, Ex. B ¶ 3; ECF No. 19-8, 2 RT 249,

21   255; *Hooper v. Shinn*, 985 F.3d 594, 620 (9th Cir. 2021) (evidence disclosed by prosecution at trial

22   was not suppressed where defendant "had a meaningful opportunity to" use it and "fails to show

23   how earlier disclosure would have made this evidence more useful to his defense").

24       Further, Petitioner had access to the Video Footage as early as September 8, 2017—a month

25   and a half before trial—if not as early as July 9, 2017, when El Cerrito Police Officers seized the

26   computer containing the Video Footage.  *See* ECF No. 19-9, 3 RT 343:23–27, 348; *see also*

27   ECF No. 19-8, 2 RT 251:9–15; *Cunningham*, 704 F.3d at 1154 ("There was no suppression of this

28   easily attainable evidence.").  Nonetheless, Petitioner chose not to examine the Video Footage

United States District Court
Northern District of California

before trial.  *See* ECF No. 19-9, 3 RT 343:23–27, 348.  Additionally, once Sergeant Wentworth testified about the Video Footage, Petitioner had the opportunity to examine the Video Footage by making an appointment with the El Cerrito Police Department.  *See* Tully Decl., ECF No. 1, Ex. B ¶ 3; ECF No. 19-8, 2 RT 249, 255.

Petitioner argues that the Prosecutor suppressed the Video Footage by denying its existence on the record.  First, the record does not support Petitioner's claim that the Prosecutor denied the existence of the Video Footage.  Rather, the Prosecutor made objections to testimony about the Video Footage, because the Prosecutor asserted that the only indication in the evidence log or otherwise was that a device had been seized—not that there was necessarily intact Video Footage on the device.  *See* ECF No. 19-6, 1 RT 180:23–181:5; ECF No. 19-9, 3 RT 349:23–26.  Second, the Court does not see how the Prosecutor allegedly denying the existence of the Video Footage is significant, because the record indicates that Petitioner knew about the Video Footage weeks before trial and that it was potentially exculpatory.  *See* ECF No. 19-1, 1 CT 62:9–15.  Accordingly, even if the Prosecutor had denied the existence of the Video Footage, Petitioner still knew about it and could have taken the opportunity to examine it.  *See* ECF No. 19-9, 3 RT 343:23–27, 348; ECF No. 19-8, 2 RT 249, 255.  Petitioner further argues that the Prosecutor suppressed the Video Footage by suggesting that the video surveillance system had been potentially rendered nonfunctional by Petitioner's father.  *See* Reply, ECF No. 22-1 at 5.  Again, the Prosecutor raised only the possibility that the video surveillance system was nonfunctional, and Petitioner had ample opportunity—before and during trial—to examine the video surveillance system and determine that the Video Footage was intact.

Petitioner further argues that the Prosecutor suppressed the Video Footage by not seeking a warrant to examine it.  *See* Amended Petition, ECF No. 8 at 27.  The Court agrees with Petitioner that his refusal to provide consent for the Prosecution to examine the Video Footage did not insulate it from *Brady*.  *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  However, the Court also does not see how the Prosecution suppressed the evidence by not seeking a warrant to examine the Video Footage, particularly where Petitioner clearly knew about the Video Footage and had ample opportunity to examine it.  *See, e.g.*, ECF No. 19-1, 1 CT 62:9–15; ECF No. 19-9, 3 RT 343:23–27,

348; ECF No. 19-8, 2 RT 249, 255; *Raley*, 470 F.3d at 804 ("[W]here the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense.") (quotation marks and citation omitted).  Petitioner can point to no relevant case authority indicating that it was necessary to seek a warrant to investigate the Video Footage under the circumstances indicated by the record.

Additionally, Petitioner argues that the Video Footage was suppressed because the El Cerrito Police Department was not able to accommodate Mr. Tully's request to examine it during trial.  But the record indicates that Petitioner knew about the Video Footage and had ample opportunity to examine it before trial.  *See, e.g.*, ECF No. 19-1, 1 CT 62:9–15; ECF No. 19-9, 3 RT 343:23–27, 348; ECF No. 19-8, 2 RT 249, 255.  So the Court does not see how the El Cerrito Police Department's inability to accommodate Mr. Tully's request to examine the Video Footage during trial makes a difference.  Further, Petitioner can point to no authority indicating that if a defendant is given the opportunity to make an appointment with a government agency to view potentially exculpatory evidence and the agency cannot accommodate the defendant's request, then this constitutes a *Brady* violation.  The Court is particularly reluctant to find a *Brady* violation when the factual record before the Court regarding Petitioner's requests of the El Cerrito Police Department is so minimal.  For instance, the Court has no indication of the reasonableness of trial counsel's requests of the El Cerrito Police Department.  And the record shows that Petitioner expressly waived the opportunity to "ask [the trial court] to delay the case so that [he could] run out and look at [the] video."  ECF No. 19-9, 3 RT 343:16–17.

Accordingly, the record indicates that Petitioner had a meaningful opportunity to obtain and use the Video Footage—both before and during trial.  Based on these facts, the Court finds on *de novo* review that Petitioner has failed to show that the Video Footage was suppressed, so there is no cause warranting an exception to the procedural bar to Petitioner's *Brady* claim found by the State Appellate Court.

**b.  Prejudice:  Whether the Video Footage Was "Material"**

Petitioner argues that the Video Footage satisfied the materiality requirement of a *Brady*

United States District Court
Northern District of California

claim. *See* Amended Petition, ECF No. 8 at 29–33. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cone*, 556 U.S. at 469–70. "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles*, 514 U.S. at 434); *see, e.g., Wearry v. Cain*, 136 S. Ct. 1002, 1006–1007 (2016) (reversing, based on *Brady* violation, conviction where impeachment evidence as to key prosecution witnesses was suppressed; holding "[e]ven if the jury—armed with all of this new evidence—*could* have voted to convict [defendant], we have no confidence that it *would* have done so") (emphasis in original) (quotations marks and citations omitted). A reasonable probability of a total acquittal is not required to establish materiality; suppressed evidence is material if, had it been disclosed, there is a reasonable probability the defendant would have been convicted of a "different offense or a different degree of the crime." *Shelton v. Marshall*, 796 F.3d 1075, 1085 (9th Cir. 2015), *amended on reh'g*, 806 F.3d 1011 (9th Cir. 2015). Nevertheless, "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Cain*, 565 U.S. at 75. Moreover, the "mere possibility" that undisclosed information "might have helped the defense or might have affected the outcome of the trial" does not establish materiality under *Brady*. *United States v. Olsen*, 704 F.3d 1172, 1184 (9th Cir. 2013) (internal quotations and citations omitted).

As a threshold matter, the Court provides a brief description of what can be seen in the Video Footage, which Petitioner lodged with the Court. *See* ECF No. 24. The Video Footage is from a fixed camera pointed at a table in Petitioner's home covered in various belongings, including a computer, with a shelf up against a wall behind the table. *See* Video Footage. The Video Footage contains no audio. *See id.* A doorframe leading to a kitchen can be seen in the wall at the back of the room from the camera's perspective, and an additional doorframe can be seen in the back left of the room, although it is not visible where this second doorway leads. *See id.* During the first eight seconds of the video, Petitioner's elbow can be seen in the top left corner of the camera view. *See id.* at 0:00–0:08. Around nine seconds, the Video Footage shows Petitioner quickly turn toward the

back of the room. *See id.* at 0:09.  Petitioner disappears off-screen through the leftmost doorway, and two officers enter the view of the camera pursuing him. *See id.* at 0:09–0:10.  The two officers reach the doorframe on the left side of the camera view, and Plaintiff appears suddenly from off-screen moving rapidly down and to the right. *See id.* at 0:11–0:12.  Petitioner and the officers knock into a shelf at the back of the room, causing the shelf and the table to move and various items in the room to shift. *See id.* at 0:12–0:13.  The officers are then seen leading Petitioner toward the camera by restraining his arms behind his back, and then forcing Petitioner onto the ground. *See id.* at 0:13–0:14.  Two other officers enter the camera view, and the four officers proceed to handcuff Petitioner as he appears to struggle against the officers. *See id.* 0:14–0:27.  The officers are then seen holding Petitioner down for several minutes while they secure him and search his pockets, and eventually the officers lead Petitioner away. *See id.* at 0:28–3:11.

Petitioner argues that the Video Footage is material because it impeaches the testimony of two police officers—Officers Brosas and Purdy—which the prosecution relied on to support the resisting arrest charge against Petitioner. *See* Amended Petition, ECF No. 8 at 30–31.  Petitioner argues that the Video Footage shows that his arrest took approximately 2 seconds, and "the time Purdy followed petitioner towards the stairs to the time he came back down the stairs, pulling petitioner into the furniture was a fraction of a second." *See id.*  Accordingly, Petitioner argues, Officer Brosas's testimony at trial that Petitioner turned toward Officer Purdy and kicked him in the chest is improbable, if not impossible, because "[q]uite simply, there was not enough time[.]" *Id.* at 30.  Further, Petitioner raises the same argument for Officer Purdy's testimony, which indicated that Petitioner had his back turned and gave Officer Purdy a "mule kick." *See id.* at 31.  Petitioner argues the Video Footage shows there was not enough time for such a kick. *See id.*  Petitioner argues the Video Footage is particularly salient given the different descriptions Officers Brosas and Purdy provided of the arrest. *See id.*  Petitioner argues that it is reasonably likely that the jury would have rejected both officers' testimony based on the Video Footage. *See id.*  Accordingly, Petitioner argues that the Video Footage could have reasonably led to a lack of conviction on the resisting arrest charge. *See id.*  Further, Petitioner argues that in raising questions about the credibility of Officers Brosas and Purdy, the Video Footage is material to Petitioner's other charges, because these

United States District Court
Northern District of California

31

United States District Court
Northern District of California

1    charges were also supported by testimony from Officers Brosas and Purdy. *See id.* at 32–33.

2    Additionally, Petitioner argues that the Video Footage is material because it shows police officers

3    violently throwing Petitioner to the floor, supporting a possible defense that Petitioner used

4    reasonable force to defend himself against the officers' excessive force. *See id.* at 31–32.

5        In response, Respondent argues that the Video Footage is not material to any of Petitioner's

6    charges. *See* Answer, ECF No. 18-1 at 19–21. First, Respondent argues that the "crux" of

7    Petitioner's resistance charge—Petitioner's mule kick of Officer Purdy—occurred off-screen in the

8    Video Footage. *See id.* at 20. Second, Respondent argues that what is visible in the Video Footage

9    is consistent with the testimony at trial, since it shows Petitioner falling down the stairs with Officer

10   Purdy below him. *See* Answer, ECF No. 18-1 at 20. Respondent argues nothing about the timeline

11   of the video undermines the fact that a mule kick occurred while Petitioner was off-screen on the

12   stairs. *See id.* Further, Respondent argues that the Video Footage shows the officers acting

13   calmly—not using excessive force as Petitioner asserts. *See id.* at 20. Third, Respondent argues

14   that even if the Video Footage had some impeachment value, it fails to contradict the overwhelming

15   evidence of Petitioner's guilt. *See id.* at 20–21. For example, Respondent points to a transcript of

16   an audio recording contemporaneous with the arrest in which Petitioner states, "I slipped on the

17   [expletive] stairs" and Officer Purdy states, "He [expletive] karate kicked me" (ECF No. 19, AugCT

18   at 345); photographs of Officer Purdy's shirt with a "dirty shoe mark" on it (ECF No. 19-9, 3 RT

19   424–25); and the evidence of Petitioner's threats and violence against Ms. Hawks (ECF No. 19,

20   AugCT at 336–37, 339–79; ECF No. 19-8, 2 RT 316–327; ECF No. 19-11, 4 RT 598).

21        The Court agrees with Respondent that Petitioner has not adequately shown the materiality

22   of the Video Footage. The events relevant to the testimony of Officers Purdy and Brosas at issue

23   are not visible in the Video Footage. The testimony in question related to events that took place on

24   the stairs. The stairs are not visible in the Video Footage—they are off-screen through a doorframe

25   that opens to the left of the camera view. Accordingly, all that can be seen in the video footage is

26   Petitioner turning toward the doorframe, the officers following, and Petitioner falling down the stairs

27   toward the officers—all of which is consistent with the officer testimony regarding the arrest. *See*

28   *id.* at 0:11–0:12; *see also Barker v. Fleming*, 423 F.3d 1085, 1101 (9th Cir. 2005) ("The difference

32

between the story . . . that the jury knew and that which would have been presented with the withheld evidence is not significant.").

Petitioner argues that not enough time transpired while he was on the stairs for the events described in the officer testimony—specifically, Petitioner kicking Officer Purdy—to be probable or even possible. *See* Amended Petition, ECF No. 8 at 30–31. The Court disagrees. There is not a reasonable probability that a juror viewing the Video Footage would have concluded that a split-second act like a kick was unlikely or impossible during the "fraction of a second" Petitioner is on the stairs in the Video Footage. *See id.* A juror concluding a kick was unlikely or impossible is particularly improbable given that what Officer Purdy described in his testimony was a "mule kick" that did not require Petitioner to turn to face Officer Purdy. *See* ECF No. 19-9, 3 RT 463. Further, the Video Footage shows that Petitioner's velocity as he came down the stairs was rapid. This further supports that a kick could have happened quickly as Petitioner descended the stairs. While there is a possibility that a juror could have determined based on the Video Footage that a kick was improbable or impossible during the time Petitioner was on the stairs, a "mere possibility" of a different trial outcome is insufficient to satisfy the *Brady* materiality requirement. *See Olsen*, 704 F.3d at 1184.

The Court also agrees with Respondent that even if there were a reasonable probability that the Video Footage would have been sufficient to impeach Officers Purdy and Brosas, the other evidence of Petitioner's guilt was strong enough to sustain confidence in the verdict. *See Cain*, 565 U.S. at 75. Other trial evidence strongly supported the resisting arrest charge, including the audio recording of the arrest and the photograph of a dirty shoe mark on Officer Purdy's shirt. *See, e.g.*, ECF No. 19, AugCT at 345; ECF No. 19-9, 3 RT 424–25. Further, other trial evidence strongly supported Petitioner's remaining charges. *See, e.g.*, ECF No. 19, AugCT at 336–37, 339–79; ECF No. 19-8, 3 RT 316–327; ECF No. 19-11, 4 RT 598.

Petitioner argues that the Video Footage would have allowed Petitioner to raise a defense that Petitioner's conduct after he was on the ground was a reasonable defense against excessive force. *See* Amended Petition, ECF No. 8 at 31–32. Petitioner's argument is based on the contention that "[t]he suppressed video shows Purdy violently pulling petitioner down the stairs, into a piece

United States District Court
Northern District of California

of furniture, and ultimately, onto the floor." *See id.* at 31.  This is not a reasonable characterization of the Video Footage.  Any "violent[] pulling" of Petitioner, if it took place, occurs off-screen.  Petitioner disappears out-of-frame up the stairs, the officers approach the doorway leading to the stairs, and Petitioner appears moving quickly down and to the right of the frame.  *See id.* at 0:11–0:12.  There is no indication that the officers "violently pull[ed]" Petitioner down the stairs.  While it is possible that a juror would have concluded this is what took place when viewing the Video Footage, it is not reasonably probable, since there is simply not clear enough of a view of the events in the Video Footage to determine what is happening.  *See Olsen*, 704 F.3d at 1184.

Based on the above reasoning, the Court finds that there was not a reasonable probability that, had the Video Footage been disclosed to the defense, the outcome of Petitioner's trial would have been different.  Accordingly, the Court finds on *de novo* review that Petitioner has not adequately shown that the Video Footage was material for purposes of his *Brady* claim.  Thus, the Court finds that Petitioner has not adequately shown prejudice in support of his claim that the *Coleman* exception applies to the procedural bar found by the State Appellate Court.

\* \* \*

Based on the above reasoning, the Court finds on *de novo* review that Petitioner fails to show cause or prejudice resulting from the State Appellate Court's finding that Petitioner's *Brady* claim was procedurally barred.  Accordingly, Petitioner has not made an adequate threshold showing in support of his claim that the *Coleman* exception applies to the procedural bar found by the State Appellate Court.  The Court declines to reach the issue of whether the State Appellate Court's finding on the merits of Petitioner's *Brady* claim was reasonable.  *See Bradford*, 923 F.3d at 614.  Since the Court finds that the State Appellate Court had an independent and adequate state law ground for its rejection of Petitioner's *Brady* claim, and Petitioner has failed to show that an exception applies, Petitioner's second habeas claim is hereby DENIED.

## C.  Claim 3:  New Evidence

Petitioner raised a habeas claim before the Superior Court and the State Appellate Court arguing that the Video Footage was new evidence entitling him to habeas under California Penal

34

Code § 1473, which provides the following:

> (b) a writ of habeas corpus may be prosecuted for, but not limited to, the following reasons:
>
> …(3)(A) New evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial.
>
> (B) For the purposes of this section, "new evidence" means evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral or impeaching.

Cal. P.C. § 1473(b).

The State Appellate Court did not provide a reasoned decision on this issue. Accordingly, the last reasoned decision belongs to the Superior Court. *See Ylst*, 501 U.S. at 801–806. The Superior Court held as follows:

> Petitioner also argues that he is entitled to relief under section 1473. . . . As described above, petitions for writs of habeas corpus must "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." (*People v. Duvall* (1995) 9 Cal.4th 464, 474; *see also Sherwood v. Superior Court* (1979) 24 Cal.3d 183, 186–187).) Again, Petitioner's motion makes repeated references to the transcript, including discussion of witness testimony regarding the incident, which were not provided to the Court. (Pet. at 7–15, 23–26.) Thus, Petitioner has not provided adequate documentary evidence.
>
> Thus, Petitioner is not entitled to relief on this ground.

Amended Petition, ECF No. 8, Ex. D at 3–4.

Petitioner argues that the Superior Court's finding that he was not entitled to a writ of habeas corpus under California Penal Code § 1473(b)(3) violated his right to due process. *See* Amended Petition, ECF No. 8 at 41. Petitioner cites *Hicks v. Oklahoma*, which provides that "a state violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement." 447 U.S. 343, 346 (1980). Specifically, Petitioner asserts that the Superior Court's finding that he had failed to provide sufficient evidence in support of his

§ 1473(b)(3) claim was erroneous. *See id.* at 38–40.   Petitioner asserts that the Video Footage is new evidence that satisfies the requirements of § 1473(b)(3), including because the Video Footage is "material" and could not have been discovered prior to trial for the same reasons Petitioner articulated in support of his *Brady* claim. *See id.* at 37–40.

Respondent first argues that freestanding claims of actual innocence in non-capital cases are not cognizable, since the possibility of such claims is an "open question" for the Supreme Court and therefore not clearly established for purposes of 28 U.S.C. § 2254(d). *See* Answer, ECF No. 18-1 at 21–22.   Second, Respondent argues that even if a freestanding actual innocence claim were cognizable, Petitioner cannot meet the applicable "extraordinarily high" standard, given that he cannot even establish that the Video Footage was material. *See id.* at 23.   Third, Respondent argues that Petitioner's claim based on the Superior Court's arbitrary application of California Penal Code § 1473(b) is not cognizable as a federal claim, since it challenges a state court's authority to interpret and apply a state statute. *See id.* at 23.   Respondent argues that *Hicks* created a "liberty interest" only in "unqualified" state statutes—not determinations made under state law in the exercise of discretion. *See id.* at 23–24.   Fourth, Respondent argues that even if a claim based on the Superior Court's application of § 1473(b) was cognizable, Petitioner fails to show that the Superior Court was arbitrary, because the Superior Court found that Petitioner had failed to show diligence. *See id.* at 24.   Further, Respondent argues that the Video Footage was neither material nor exculpatory. *See id.* at 25.

"[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts"; "federal habeas corpus relief does not lie for errors of state law." *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (emphasis in original).   Where, as here, a petitioner's claim is based on an allegedly erroneous application of a state statute, the petitioner is not entitled to relief unless that error "also entailed the infringement of [a] federal right." *Id.*; *see also Estelle*, 502 U.S. at 67.

Of relevance here, the U.S. Supreme Court has expressly left "open" the question of whether "an asserted federal constitutional right to be released upon proof of 'actual innocence'" exists. *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009); *see also Herrera v.*

*Collins*, 506 U.S. 390, 400 (1993) ("[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."). Thus, the U.S. Supreme Court has never clearly established that a defendant's federal constitutional rights are violated by a failure to vacate his conviction upon a showing of actual innocence—regardless of whether that showing is made under a "probable innocence" standard, *see Herrera*, 506 U.S. at 402, or the lesser showing required by § 1473(b)(3). For that reason, the Superior Court's rejection of Petitioner's claim based on newly discovered evidence cannot be contrary to, or an unreasonable application of, clearly established federal law. *Accord Valerio v. Frauenheim*, No. 2:17-CV-07706-MAA, 2019 WL 6310267, at *36 (C.D. Cal. Nov. 25, 2019); *see Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonably applied clearly established Federal law.") (internal quotations and alterations omitted).

Petitioner does not dispute any of the foregoing; indeed, he disclaims asserting a freestanding right to relief upon proof of actual innocence. *See* Reply, ECF No. 22-1 at 6–7. Rather, Petitioner argues that a different "federal right" has been violated here: his right to due process, as articulated in *Hicks*. In that case, the U.S. Supreme Court held that "[a] State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (citing *Hicks*, 447 U.S. at 346); *Fetterly v. Paskett*, 997 F.2d 1295, 1300 (9th Cir. 1993) ("[T]he failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state.").

In this case, the "state law entitlement" Petitioner asserts is state habeas relief. That is, Petitioner argues that because he satisfied the requirements for relief under California Penal Code § 1473(b)(3), the Superior Court violated his Fourteenth Amendment right to due process by finding that he "was not entitled to habeas relief" under § 1473(b). *See* Amended Petition, ECF No. 8 at 41; Reply, ECF No. 22-1 at 7.

Petitioner's argument lacks merit. California Penal Code § 1473(b)(3) provides for state habeas relief if "[n]ew evidence exists that is credible, material, presented without substantial delay,

United States District Court
Northern District of California

and with such decisive force and value that it would have more likely than not changed the outcome at trial." Under *Hicks*, Petitioner was "entitled" to invoke the state statutory procedure afforded by California Penal Code § 1473; *i.e.*, he was entitled to have the state court consider his new evidence and determine whether it justified habeas relief.  He was not, however, "entitled" to substantive relief under § 1473. *See Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992); *accord Prescott v. Santoro*, No. 5:16–CV–01359–EJD, 2019 WL 6771826, at *6 (N.D. Cal. Dec. 12, 2019).  In this case, there was no deprivation of Petitioner's state law entitlement to have his claim based on newly discovered evidence considered—arbitrary or otherwise.  Petitioner was able to litigate his state law claim under § 1473(b), and the Superior Court found that he had not presented adequate evidence to support such a claim. *See* Amended Petition, ECF No. 8, Ex. D at 3–4.  That is all § 1473(b)(3) entitles him to.

Even if Petitioner's habeas claim under § 1473(b) were cognizable, the Court's findings on *de novo* review above that the Video Footage was neither suppressed nor material would foreclose Petitioner's § 1473(b) claim. *See* Cal. P.C. § 1473(b) (requiring "new evidence" to be material and such that it "could not have been discovered prior to trial by the exercise of due diligence").

Accordingly, the Court DENIES Petitioner's third habeas claim.

### D.    Request for Evidentiary Hearing

AEDPA standards aim to prevent federal courts from re-trying state proceedings through habeas petitions. *See Cullen v. Pinholster*, 563 U.S. 170, 186 (2011).  Under AEDPA, § 2254(d) governs the standards for granting relief, while § 2254(e) governs the standards for granting an evidentiary hearing.  To obtain an evidentiary hearing and present evidence for the first time in federal court, a petitioner must first satisfy § 2254(d). *See Cullen*, 563 U.S. at 183; *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014).  This is because the Supreme Court has held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review. *Cullen*, 563 U.S. at 182–83; *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d)

United States District Court
Northern District of California

precludes habeas relief.").

### E.     Certificate of Appealability

No certificate of appealability is warranted in this case.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## V.     ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.       Petitioner's habeas petition is DENIED;

2.       Petitioner's request for an evidentiary hearing is DENIED; and

3.       a Certificate of Appealability is DENIED.


Dated:  July 25, 2022

_____

BETH LABSON FREEMAN
United States District Judge